Matter of Cooper v Nicholson (2018 NY Slip Op 08295)





Matter of Cooper v Nicholson


2018 NY Slip Op 08295


Decided on December 5, 2018


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on December 5, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

ALAN D. SCHEINKMAN, P.J.
MARK C. DILLON
HECTOR D. LASALLE
VALERIE BRATHWAITE NELSON, JJ.


2017-11293
2017-11305
2017-11307
 (Docket Nos. V-6467-16, V-9146-16)

[*1]In the Matter of Latisha Cooper, respondent,
v
Maliek Nicholson, appellant. (Proceeding No. 1)
In the Matter of Maliek Nicholson, appellant,Latisha Cooper, respondent. (Proceeding No. 2)


Daniel P. Moskowitz, Jamaica, NY, for appellant.
Warren S. Hecht, Forest Hills, NY, for respondent.
Austin I. Idehen, Jamaica, NY, attorney for the child.



DECISION & ORDER
In related proceedings pursuant to Family Court Act article 6, the father appeals from three orders of the Family Court, Queens County (Ashley Black, Ct. Atty. Ref.), all dated October 5, 2017. The first order, insofar as appealed from, after a hearing, granted the mother's petition for sole custody of the parties' child, dismissed the father's petition for sole custody of the parties' child, and awarded sole legal and physical custody of the parties' child to the mother. The second order, insofar as appealed from, awarded sole legal and physical custody of the parties' child to the mother. The third order dismissed the father's petition for sole custody of the parties' child.
ORDERED that the first and second orders are affirmed insofar as appealed from, without costs or disbursements; and it is further,
ORDERED that the third order is affirmed, without costs or disbursements.
The parties have one child in common. Beginning shortly after the child's birth, the parties and the child resided together in the paternal grandmother's home.
According to the mother's hearing testimony, she worked two jobs to provide for the father and the child, while the father, assisted by the paternal family, functioned as the primary caretaker of the child. The mother not only provided financially for herself, the father, and the child, but also contributed money to the paternal grandmother for rent. The father was not working and received financial support from his mother. However, at times the father contributed financially to help pay some of his mother's and the mother's bills, but the mother did not know the source of his income. The father expressed his great dissatisfaction to the mother that, as a result of her [*2]employment, it was necessary for him to provide care to the child. Nonetheless, the father did not accept the mother's proposal that they find jobs that would allow them to work complementary hours so that they could share in the child care responsibilities, although he told her he was looking for employment.
The mother testified that when she began working a second job, which extended her work day from approximately 7:00 or 8:00 a.m. until as late as midnight, the parties' relationship became increasingly "intense." According to the mother, in approximately September 2015, the parties stopped "sharing a bed as man and woman," and the father told the mother to pack her things and leave the paternal grandmother's home.
Shortly thereafter, the father told the mother that their relationship was over, began bringing another woman into his bedroom in the paternal grandmother's home, and told the mother to move out of the home without the child. The mother at first refused to leave the paternal grandmother's home without the child. Nonetheless, the mother testified that she left the paternal grandmother's home after an incident in October 2015 during which the father punched the mother, causing her to sustain bruising to her nose and face, and blackened eyes. The mother sent text messages to the paternal grandmother regarding the incident as well as the father's demands that the mother not return and that the child remain in the paternal grandmother's home.
After the mother left the paternal grandmother's home, the mother remained in contact with the paternal grandmother with respect to the welfare of the child. However, the mother saw the child only minimally during the ensuing six months until she commenced a custody proceeding upon the advice of a caseworker for the Administration for Children's Services. After the mother filed petitions for a writ of habeas corpus and for sole custody of the child, the father filed a petition for sole custody of the child. During the pendency of the proceedings, temporary orders of custody were issued in favor of the father with temporary parental access to the mother on weekends.
The mother further testified that she should be awarded custody of the child because of the father's domestic violence and her ability to provide support for herself and the child. In addition, the mother testified that, whereas the father had demonstrated a willingness to withhold access to the child from her, she would facilitate access to the child for the father. The father testified that he should be awarded custody of the child because he had "sacrificed" his life and had stopped working in order to care for the child. However, the father also testified that sacrificing his life and his employment did not mean that he "completely stopped working" and that, although he performed work off the books, he managed to provide for himself "pretty well" and admitted that he owned a BMW. After the hearing, the Family Court granted the mother's petition for sole custody of the child and dismissed the father's petition for sole custody of the child. The father appeals.
"When determining custody cases, the primary concern is the best interests of the child" (McDonald v McDonald, 122 AD3d 911, 911 [internal quotation marks omitted]; see Eschbach v Eschbach, 56 NY2d 167, 171; Matter of Islam v Lee, 115 AD3d 952, 953). The existence or absence of any one factor in determining custody cannot be determinative on appellate review since the court is to consider the totality of the circumstances (see Eschbach v Eschbach, 56 NY2d at 174; Matter of McLennan v Gordon, 122 AD3d 742). "As custody determinations turn in large part on assessments of the credibility, character, temperament, and sincerity of the parties, the Family Court's determination [following a complete evidentiary hearing] should not be disturbed unless it lacks a sound and substantial basis in the record" (Matter of Jurado v Jurado, 119 AD3d 796, 796 [internal quotation marks omitted]; see Eschbach v Eschbach, 56 NY2d at 173; Matter of McKenzie v Williams, 165 AD3d 673; Matter of Tejada v Tejada, 126 AD3d 985).
Here, the Family Court's determination that an award of custody to the mother was in the child's best interests has a sound and substantial basis in the record (see Matter of McKenzie v Williams, 165 AD3d 673; Matter of Garcia v Perez, 48 AD3d 812). Contrary to the father's contention, the court carefully considered all of the relevant factors in making its determination (see [*3]Matter of Craig S. v Emily S., 149 AD3d 751).
The record supports the Family Court's finding that the father prohibited the mother from removing the child from the paternal grandmother's home after the mother left that home due to the father's directives, threats, and behavior. The father's decision to invite his paramour into the residence where the mother was residing, his punching of the mother during an altercation between the mother and his paramour, and his banishment of the mother from the home of the paternal grandmother and, by extension, from the child, reflect that he was focused primarily on his own self-interests as opposed to the child's best interests. These acts properly affected the court's assessment of the father's fitness, judgment, and decision making. "Willful interference with a noncustodial parent's right to [parental access] is so inconsistent with the best interests of the child[ ] as to, per se, raise a strong probability that the offending party is unfit to act as a custodial parent" (Matter of Bullard v Clark, 154 AD3d 846, 847; see Matter of Khan-Soleil v Rashad, 111 AD3d 728; Matter of Lawlor v Eder, 106 AD3d 739). In contrast, there was no indication in the record that the mother would prohibit the father's parental access with the child.
Additionally, despite the father having an inconsistent and flexible work schedule, he voluntarily diminished his quality time with the child by enrolling the child in day care for 11 hours a day, five days a week, with the child residing with the mother on the weekends.
The Family Court also appropriately found that, while the quality of the parties' respective homes appeared to be on par with each other, the father was immature, refused to accept responsibility, and lacked insight into his behavior, and the mother had a superior ability to provide financial support for the child.
Accordingly, the Family Court's custody determination should not be disturbed.
SCHEINKMAN, P.J., DILLON, LASALLE and BRATHWAITE NELSON, JJ., concur.
ENTER:
Aprilanne Agostino
Clerk of the Court